IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>1) SIM Card, "Telcel"<br>2) Mobile Phone bearing IMEI: 990016801740562<br>3) Samsung Mobile Phone (White), bearing IMEI: 358765/61/578636<br>4) ZTE Mobile Phone (Black with stickers on case depicting a shark and Ironman), unknown IMEI<br>5) Motorola Mobile Phone (Red), unknown IMEI<br>6) Samsung Mobile Phone (Pokemon sticker), bearing IMEI: 350490660179317<br>Currently located at the Federal Bureau of Investigation, located at 5425 West Amelia Earhart Drive, Salt Lake City, Utah, 84116. | Case No. 2:24-mj-00752 - 757 DBP |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, JENNIFER M. WATERFIELD, a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), Salt Lake City Division, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKROUND

1

1.      I have been employed as a Special Agent of the FBI since March 28, 2010, and am currently assigned to the Salt Lake City Field Office and the FBI Child Exploitation and Human Trafficking Task Force. I am also a member of the FBI Child Abduction Rapid Deployment Team, which deploys nationwide to investigate the mysterious disappearances of children. I have been involved in investigations related to the sexual exploitation of children over the internet since 2011. Since joining the FBI, I have investigated violations of federal law, and am currently investigating federal violations concerning kidnapping, child pornography and the sexual exploitation of children. I have gained experience through training in seminars, classes, and everyday work related to conducting these types of investigations. I have been involved in numerous investigations involving sex crimes against children, to include leading investigations related to the sexual exploitation of children over the internet, writing and executing search warrants, conducting undercover operations via the internet, interviewing victims, interviewing suspects and conducting arrests.

2.      Prior to this assignment, I was a Supervisory Special Agent ("SSA") in the FBI's Behavioral Analysis Unit ("BAU")-3/ Crimes Against Children, for approximately five-and one-half years in Quantico, Virginia. During that time, I was certified in Criminal Investigative Analysis (more commonly known as criminal and/or psychological profiling). As a BAU-3 SSA or "Profiler," I consulted on numerous cases involving child abductions, child homicides, child torture and sexual exploitation of children. I provided case consultation, interviewed incarcerated child sex offenders,

provided training to local, state, tribal and federal law enforcement partners, and conducted and published research related to crimes against children. Your affiant was also previously assigned to FBI Honolulu for approximately five years, investigating both violent crimes and violent crimes against children.

3.     As a federal agent, your affiant is authorized to investigate violations of laws of the United States and is a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

4.     The statements in this affidavit are based upon my personal observations, my training and experience, and on information provided by law enforcement officers assigned to other law enforcement agencies, other FBI special agents and employees. As this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me concerning this investigation.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1204(b) (International Kidnapping); 18 U.S.C. § 2252(a)(1) (Transportation of Child Pornography); 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography); 18 U.S.C. § 2251 (Production and Attempted Production of Child Pornography); 18 U.S.C. § 2422(b) (Coercion/Enticement of a Minor to Engage in Sex Acts); and 18 U.S.C. § 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct) (collectively, the "SUBJECT OFFENSES") have been committed by Antonio MORENO CISNEROS ("MORENO CISNEROS"). There is also probable cause to search the device described

3

in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes, as described in Attachment B.

## SUMMARY

6.      As set forth in detail below, MORENO CISNEROS has been accused of sexually abusing his 14-year-old niece EG, who lives in Ogden, Utah from approximately January/ February 2024 to July 12, 2024. EG disclosed the sexual abuse to her mother, via a telephone call on June 30, 2024. On that same day, MORENO CISNEROS flew from Salt Lake City to Mexico City and abducted EG and her young cousins (which are his biological daughters). For thirteen days, MORENO CISNEROS evaded law enforcement while he traveled around Mexico with all 3 girls, until he was arrested by Mexican law enforcement officers on June 12, 2024, and the girls were taken into protective custody. Five mobile phones and one SIM card were seized from MORENO CISNEROS at the time of his arrest, which were transported by the FBI to Salt Lake City, Utah.  During a forensic interview with EG, she disclosed she was raped by MORENO CISNEROS four times at her residence in Ogden, Utah, and once at a hotel in Villahermosa, Tabasco in Mexico. In addition, EG disclosed that she was instructed to produce and send child sex abuse material to MORENO CISNEROS via mobile phone.  EG received nude images of MORENO CISNEROS including his penis, which was sent from his mobile phone. The seized devices are further described in Attachment A.

## DEFINITIONS

7. The following definitions apply to this Affidavit and Attachment B to this Affidavit:

8. "Child Pornography" includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

9. "Visual depictions" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image See 18 U.S.C. § 2256(5).

10. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

11. "IP Address" means Internet Protocol address, which is a unique numeric address used by computers on the Internet. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP

addresses.

12.     "Internet" means a global network of computers and other electronic devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

13.     In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

## BACKGROUND REGARDING THE INTERNET AND CHILD EXPLOITATION

15.     I have been formally trained in the investigation of crimes involving the sexual exploitation of children.   I also own my own computer, have personal knowledge of the operation of a computer, and have accessed the Internet for numerous years.   Based on this training and knowledge, and the experience of other law enforcement personnel involved in this investigation, I know the following:

16.     Child pornographers can produce images using a wireless device such as a

cell phone.  Photos can also be made using cameras, then can be transferred onto another device either using wire or wireless technology.  Images can also be uploaded to Internet-based storage commonly referred to as the "cloud." Hard-copy images can also be scanned into a computer.  Via the Internet, connection can be made to literally millions of computers around the world.  Child pornography can be transferred quickly and easily via electronic mail or virtually countless other online platforms, communication services, storage services, and applications.

17.     A computer's capability to store images in digital form makes it an ideal repository for child pornography and other files related to the sexual abuse and exploitation of children.   The digital-storage capacity in devices and in the "cloud" has grown tremendously within the last several years.  Thumb drives with a capacity of 32 gigabytes are not uncommon.  Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon.  Phones with over 100 gigabytes in storage are not uncommon.  Devices can store thousands of images and videos at very high resolution.  These devices are often internet capable and can not only store but can transmit images via the internet and can use the devices to store images and documents in internet or "cloud" storage spaces.  Once this is done, there is no readily apparent evidence at the "scene of the crime".   Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

18.     With Internet access, a computer user can transport an image file from the Internet or from another user's computer to his own computer, so that the image file is

stored in his computer.  The process of transporting an image file to one's own computer is called "downloading".  The user can then display the image file on his computer screen and can choose to "save" the image on his computer and/or print out a hard copy of the image by using a printer device (such as a laser or inkjet printer).  Sometimes the only method to recreate the evidence trail of this behavior is with careful laboratory examination of the computer, modem, printer, and other electronic devices.

19.   I know from training and experience that search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to obtain child pornography to include credit card bills, telephone bills, correspondence and other identification documents.

20.   I know from training and experience that search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

## MOBILE APPLICATIONS AND THE SEXUAL EXPLOITATION OF CHILDREN

21.   I know from training and experience that many involved in the sexual exploitation of children use mobile applications to facilitate the sexual exploitation of children. There are millions of applications or "apps" available for download to any user with access to the Internet. Popular apps including Instagram, Facebook, Facebook

Messenger, WhatsApp, Snapchat and others are commonly downloaded to a mobile device or smart phone (Although apps can also be downloaded to other internet connected devices like a desktop computer or laptop computer.).

22.     Many of these apps have a social media function which allows a user to create their own profile and communicate with other users. Depending on the application, the communication can occur as text messaging, voice messaging, and/or live stream video messaging. Apps also often allow for the sharing of files between users. These files can be images or videos and are often sent as attachments to a message. These files can then be stored online (for example in the message history or thread on an Internet Service Provider's servers) or downloaded to the individual's device(s).

23.     Individuals with a sexual interest in children can and often do use social media applications to communicate with other individuals with a sexual interest in children. I have worked several cases where individuals with a sexual interest in children have used social media applications to obtain, distribute, and manufacture child pornography. I also know that individuals with a sexual interest in children can, and often do use social media applications to communicate with minors for the purpose of obtaining sexually explicit images of the children with whom they are communicating. These individuals often use multiple applications to communicate with victims and often create a profile where they pretend to be someone else. I have been involved in several investigations where an individual with a sexual interest in children has used social media mobile applications to communicate with children for the purpose of obtaining sexually

explicit images and videos of the child, or for the purpose of meeting the child in person to engage in illegal sexual conduct.

## INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN AND RECEIVE AND/OR DISTRIBUTE CHILD PORNOGRAPHY

24.     Based on the facts set forth below, there is probable cause to believe that MORENO CISNEROS is someone with a sexual interest in children and images of children.   Based on my previous training and experience related to investigations involving child pornography and the sexual abuse of children, I have learned that individuals like MORENO CISNEROS who have a sexual interest in children/images of children, there are certain characteristics commonly found in these individuals:

a. The majority of individuals who create and collect child pornography are persons who have a sexual attraction to children.   They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature

b. Individuals who create and collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification.

c. These individuals often also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which

nonetheless fuel their deviant sexual fantasies involving children.  Non-pornographic, seemingly innocuous images of minors are often found on computers and digital storage devices that also contain child pornography, or that is used to communicate with others about sexual activity or interest in children.  Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant.   In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

d.  Many individuals who create and collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.  They regularly maintain their collections in the privacy and security of their homes, cars, garages, sheds, or other secure storage location, such as on their person. Many also frequently delete their collection of child pornography, as well as wipe their digital devices in an attempt to destroy evidence and evade law enforcement.

e.  Individuals who create and collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. This contact helps

11

these individuals to rationalize and validate their deviant sexual interest and associated behavior.  The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

f. Individuals who create and collect child pornography often maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children, as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires.  Such individuals rarely destroy these materials because of the psychological support they provide.

g. Individuals who create and collect child pornography often collect, read, copy or maintain names, screen names or nicknames, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests.  These contacts are maintained as a means of personal referral, exchange or commercial profit.  These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

12

25.     Based upon training and experience, I know that persons in engaged in the production and possession of child erotica are also often involved in the production and possession of child pornography.  Likewise, I know from training and experience that persons involved in the production and possession of child pornography are often involved in the production and possession of child erotica.

26.     Based on my training, knowledge, experience, and conversations with others in law enforcement, I understand that an individual who possesses images and/or videos depicting child pornography on one digital storage devices and/or Internet email or online storage account is likely to possess child pornography on additional digital storage devices and/or Internet email or online storage accounts that s/he possesses. Additionally, based on this training and experience, I understand that an individual who discusses the sexual abuse and/or exploitation of children on one digital storage device is likely to conduct those communications on additional digital storage devices that s/he possesses.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

27.     Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment.  This is almost always true because of the following:

    a.  Computer storage devices (like hard disks, diskettes, tapes, laser disks,

magneto opticals, and others) can store the equivalent of thousands of pages of information.  Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names.  This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.  This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

b.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data.  The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

28.    In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit (CPU).  In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may

be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

29.    In addition, there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, and modem are all instrumentalities of the crime(s), within the meaning of 18 U.S.C. §§ 2251, 2252, 2252A, 2422, and 2423 and should all be seized as such.

## SEARCH METHODOLOGY TO BE EMPLOYED

30.    The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a.   examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

b.   searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified

15

above);

    c.  surveying various file directories and the individual files they contain;

    d.  opening files in order to determine their contents;

    e.  scanning storage areas;

    f.  performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment A; and/or

    g.  performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

## PROBABLE CAUSE

31.    The following is based on my knowledge and experience, and on information received from other individuals, including law enforcement officers, as well as their reports:

32.    EG is a 14-year-old female who lives with her mother, AS, in Ogden, Utah and is a Citizen of the United States. On June 15, 2024, EG traveled to Mexico City, Mexico to visit family and was scheduled to return on August 7, 2024. EG was kidnapped by her uncle Antonio MORENO CISNEROS and had no contact with, AS, from June 30 through July 12, 2024. MORENO CISNEROS is not a United States Citizen but had resided in Utah for the past three years.

33.    EG traveled to Mexico to visit family last summer, in 2023. Around the time EG returned home from that trip, MORENO CISNEROS began exhibiting grooming

16

behaviors towards EG. MORENO CISNEROS began staying at EG and her mother's residence in Ogden, Utah, on the weekends, while his primary residence was in Kaysville, Utah. MORENO CISNEROS began paying more attention to EG and favoring her compared to EG's siblings, completing chores for her when AS had asked EG to complete them.

34.     MORENO CISNEROS began to follow EG. For example, if EG went into her room, MORENO CISNEROS would go into her room as well. MORENO CISNEROS also began to be more physical towards EG and started to hug her more often. MORENO CISNEROS also gave EG a gift, which your Affiant knows can be a common tactic when grooming a child for sexual purposes. In December 2023, MORENO CISNEROS gave EG a bottle of perfume with a note which read "Que este perfume sea solo el complemento de tu incredible esencia, que por si sola ya es especial y unica. TQM… TT", which summarized in English states, *This perfume is to only complement your incredible essence, which itself is already special and unique.* Your affiant understands "TQM" to mean Te Quiero Mucho, meaning *I love you very much*. Also, AS advised "TT" meant *Tio Tonio*, or Uncle Tony in English, referring to Antonio (Tony) MORENO CISNEROS.

35.     In the weeks prior to EG leaving for Mexico City on June 15, 2024, AS began noticing that EG was distancing herself from others, seeming withdrawn and depressed. AS thought it would be a good idea for EG to visit her grandmother and

extended family in Mexico. EG's grandmother had a recent surgery and EG could be of help to her in recovery.

36.     On approximately May 30, 2024, AS found an empty "Plan B" Emergency Contraception package in EG's pocket. AS questioned EG, who initially stated that it belonged to a friend. EG ultimately admitted that the "Plan B" pill was for her but did not give any further details about any sexual activity or with whom she was sexually active, other than it was a boy from school.

37.     On June 15, 2024, EG traveled by herself via airplane to Mexico City, Mexico. On or about June 29, 2024, EG was with her aunt walking near a street vendor. They saw a vender selling a coin bank in the shape of a penis. EG's aunt observed EG take a picture of the bank with her phone and send it through text message to MORENO CISNEROS. EG's aunt asked EG how MORENO CISNEROS responded. EG advised MORENO CISNEROS stated, "That won't fit in your mouth". EG's aunt notified AS of the text message.

38.     On the morning of June 30, 2024, AS spoke with EG over the phone and asked her about her relationship with MORENO CISNEROS. EG discussed MORENO CISNEROS' grooming behavior over the past year and stated that the relationship became sexual "at the end". EG stated that she had sex with MORENO CISNEROS four times. EG also admitted that MORENO CISNEROS had given her the "pills" on two occasions.

18

39.     Due to the inappropriate text messaging and sexual relationship between EG and MORENO CISNEROS, EG's aunt took EG's phone and did not give it back to her.

40.     Sometime after 2:00 p.m. on June 30, 2024, EG left the residence she was staying in Mexico City with her two cousins, ages six and four, who were biological children of MORENO CISNEROS and identified as SMZ and RMZ, respectively. Her family members at the Mexico City residence believed they were going to the store. EG never returned with her cousins. EG was last seen before she left the residence wearing a black hoodie, dark pants and black and white Vans shoes.

41.     On June 30, 2024, without notifying any of his family members living with him in Kaysville, Utah, MORENO CISNEROS boarded a flight in Salt Lake City, Utah bound for Mexico City. A subpoena to Delta Airlines provided records showing MORENO CISNEROS utilized Expedia.com, a third party travel booking website, on June 29, 2024, to purchase a seat for $862.96 on Delta Flight 268, which departed Salt Lake City on June 30, 2024, at approximately 9:40 a.m. MORENO CISNEROS did not pay for any checked baggage and purchased the ticket using a credit card. The flight arrived in Mexico City at approximately 1:22 p.m. Mexican immigration authorities confirmed MORENO CISNEROS arrived in Mexico City on Delta Flight 268 and passed through customs using his Mexican passport.

42.     Shortly after EG left the residence on June 30, 2024, EG was observed on surveillance video, wearing the same clothing she was wearing when she left the

residence. EG was walking down a street a short distance away from the residence with her younger cousins, SMZ and RMZ, the children of MORENO CISNEROS. EG was observed talking on a phone and appeared to be looking for somebody or something. Although EG did not have a phone, her younger cousin, SMZ, did.

43.     Telephone records revealed SMZ's telephone was in contact with MORENO CISNEROS' telephone multiple times after 1:24 p.m. on June 30, 2024.

44.     In the surveillance video capturing EG and her cousins walking down the street, they are observed stopping in front of a building. Immediately after they stop a taxicab stops on the street next to them. A male, who resembles MORENO CISNEROS, stepped out of the back seat of the taxi, and one of EG's cousins ran to the male as if she was familiar with him. The male, EG, and the two younger cousins, all entered the taxi and it drove away.

45.     Information was obtained MORENO CISNEROS used multiple email addresses, including: a.moreno.am52@gmail.com. In response to an exigent records request, Google, Inc. provided subscriber information and location data for the email address listed, including latitude and longitude coordinates. The email a.moreno.am52@gmail.com was created on March 17, 2012, by "Antonio Moreno." The first location on June 30, 2024 from 6:00pm- 6:08pm was 19.4299149, -99.1126823 or 7 de Julio, Venustiano Carranza, 15390 Mexico City, Mexico. This is the ADO Terminal TAPO, which is a bus terminal in Mexico City. The second location on July 1, 2024, from 9:03am- 3:59pm was 19.1793353, -96.1342079 or 91910 Calle Salvador Diaz Miron 1612

Colonia Zaragoza, 91910. This is the location for the Hotel Central Veracruz, in Veracruz, Mexico. The third location on July 1, 2024, from 11:09pm to 11:29pm was 17.9965039, -92.9212867, which is the location of the Villahermosa Oriente Bus Station, in Villahermosa, Tabasco. The fourth location on July 3, 2024, from 10:58am- 11:13am was 18.0024344, -92.9298972, which is the approximate location of the Hotel and Suites Del Lago in Villahermosa, Tabasco. Your affiant is aware an email account may be accessed through a device, such as a mobile phone, which can connect to wireless internet and/or a cellular data plan.

46.    On July 9, 2024, law enforcement authorities in Mexico confirmed MORENO CISNEROS, EG, SZM and RZM arrived at the bus station in Veracruz, Mexico, on bus number 646, at 5:50pm. Surveillance images at 6:08pm, show MORENO CISNEROS, along with all three girls walking through the bus station in Veracruz, Mexico.

47.    On July 12, 2024, MORENO CISNEROS was arrested by Mexican authorities in Veracruz, Mexico while he was walking in an area common among tourists, with EG, SMZ and RMZ. MORENO CISNEROS had five mobile phones and one SIM card in his possession, which were seized by Mexican authorities.  EG and her cousins were placed in the custody of Mexican authorities and transported to Mexico City, Mexico.

48.    On July 13, 2024, a FBI victim specialist and special agent from Salt Lake City, Utah, traveled to Mexico City, Mexico, where the special agent took custody of the evidence seized from MORENO CISNEROS: five mobile phones and one SIM card, as

well as clothing collected from EG. The following morning, the FBI personnel departed

Mexico City, Mexico, with EG and the evidence provided by the Mexican authorities.

    49.    On July 15, 2024, EG had a medical evaluation and was forensically

interviewed at a Children's Justice Center in Utah and disclosed the following:

    a.   EG was digitally penetrated and vaginally raped by her "Uncle Tony"
(MORENO CISNEROS) on four occasions at her residence in Ogden,
Utah, between Jan/February 2024 to June 15, 2024, and was provided
with "Plan B" emergency contraception by MORENO CISNEROS on
two occasions

    b.   EG described freezing when MORENO CISNEROS started sexually
assaulting her on the first occasion. EG tried to push him off her and
tried to call out for help, however she couldn't get any words to come
out. EG wanted to tell her mom, however, could not bring herself to do
so, because MORENO CISNEROS is the brother of AS. EG felt
trapped in an "illusion" and MORENO CISNEROS eventually made
her believe this was normal, even though EG knew it was wrong.

    c.   EG was again vaginally raped by MORENO CISNEROS at a hotel in
Villahermosa, Tabasco, in Mexico and was provided with "Plan B"
emergency contraception

d.  MORENO CISNEROS communicated with EG using WhatsApp and as soon as she arrived in Mexico City, Mexico, he began sending sexual messages (AS was no longer in a position to check EG's phone)

e.  MORENO CISNEROS sent EG images of his penis using his mobile phone

f.  MORENO CISNEROS instructed EG to take and send nude images of herself to him via her mobile phone, which she did on at least once occasion

g.  On or about June 29, 2024, MORENO CISNEROS told EG he was nervous he would get in trouble "for what happened in Utah" so he wanted to return to Mexico to see his daughters because he knew things would end badly. MORENO CISNEROS asked EG to help him see his daughters. EG thought she was helping her cousins to see their dad, but immediately knew it was a bad decision.

h.  On June 30, 2024, MORENO CISNEROS called EG on SZM's phone and told her he was in Mexico City and gave her instructions to leave the residence with his daughters and start walking. EG complied and MORENO CISERNOS called EG again on SZM's phone to give specific directions where to walk. EG confirmed MORENO CISNEROS pulled up in a taxicab and SZM ran to him and they all departed in the taxi. The taxi took them to a mall near a subway

station. They took the subway to the bus station and boarded a bus for Veracruz, Mexico. They spent one night in Veracruz and then traveled by bus to Villahermosa in Tabasco, Mexico. MORENO CISNEROS had to buy clothes for all the girls because they did not have any belongings with them. They never stayed at the same hotel longer than two nights in a row because authorities would be looking for them.

i.   EG realized she had no means of communication to call for help because her phone was at the residence.

j.   MORENO CISNEROS turned off all his phones because he knew authorities would be looking for them and could track him through the phones.

k.   After approximately one week in Villahermosa they returned to Veracruz by bus. EG told MORENO CISNEROS she wanted to go home and did not want to go get food, which angered him.  MORENO CISNEROS choked EG and she could not breathe. EG cried and asked why he was treating her that way. EG said she would wait where she was or go back to the hotel, however MORENO CISNEROS kept pulling her arm and telling her "Let's go." They were located by Mexican authorities shortly thereafter.

24

50.     On July 19, 2024, your Affiant was notified EG's laboratory tests revealed she tested positive for chlamydia, which is a sexually transmitted disease.

## CONCLUSION

51.     Based on the investigation described above, probable cause exists to believe that evidence, fruits and instrumentalities of the SUBJECT OFFENSES will be located on the SUBJECT DEVICES.  I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachments A and B.

//

//

//

//

//

//

//

//

25

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated this 26th day of July 2024.

*Jennifer M. Waterfield*
_____
JENNIFER M. WATERFIELD
Special Agent,
Federal Bureau of Investigation

SUBSCRIBED and SWORN before me this __26th__ day of __July, 2024.

_____
UNITED STATES MAGISTRATE JUDGE
DUSTIN PEAD

Approved:
UNITED STATES ATTORNEY:
TRINA A. HIGGINS

CARLOS ESQUEDA    Digitally signed by CARLOS ESQUEDA
                  Date: 2024.07.26 14:21:44 -06'00'
_____
CARLOS A. ESQUEDA
Assistant United States Attorney

# ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED

7) SIM Card, "Telcel"

8) Mobile Phone bearing IMEI: 990016801740562

9) Samsung Mobile Phone (White), bearing IMEI: 358765/61/578636

10) ZTE Mobile Phone (Black with stickers on case depicting a shark and Ironman), unknown IMEI

11) Motorola Mobile Phone (Red), unknown IMEI

12) Samsung Mobile Phone (Pokemon sticker), bearing IMEI: 350490660179317

The above listed items are stored in evidence at the Federal Bureau of Investigation, located at 5425 West Amelia Earhart Drive, Salt Lake City, Utah, 84116.

## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

The following are items to be seized, which constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of 18 U.S.C. § 1204(b) (International Kidnapping); 18 U.S.C. § 2252(a)(1) (Transportation of Child Pornography); 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography); 18 U.S.C. § 2251 (Production and Attempted Production of Child Pornography); 18 U.S.C. § 2422(b) (Coercion/Enticement of a Minor to Engage in Sex Acts); and 18 U.S.C. § 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct) (collectively, the "SUBJECT OFFENSES"),

1. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, tending to evidence use of the dating application and texting application used to communicate with the undercover officer in this investigation. (These applications are known to law enforcement and will be disclosed to anyone involved in executing the search warrant.)

2. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, tending to evidence use of "WhatsApp."

3. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, tending to evidence communications, in any form, between MORENO CISNEROS and minors related to sexually explicit conduct, sexually explicit images or videos, or sexually explicit activity via webcam.

4. Images or visual depictions of child pornography.

5.  Records and information containing child erotica, including texts, images and visual depictions of child erotica.

6.  Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of the SUBJECT OFFENSES.

7.  Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning communications about child pornography or sexual activity with or sexual interest in minors.

8.  Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning Internet activity reflecting a sexual interest in minors or child pornography.

9.  Any and all information, notes, software, documents, records, or correspondence, in any form and medium pertaining to any minor who is, or appears to be, the subject of any visual depiction of child pornography, child erotica, sexual activity with other minors or adults, or of sexual interest, or that may be helpful in identifying any such minors.

10. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the computer or by other means for the purpose of committing violations of the SUBJECT OFFENSES.

11. Any and all information, notes, documents, records, or correspondence, in any format or medium, concerning membership in online groups, clubs, or services that provide or make accessible child pornography.

12. Any and all cameras, film, videotapes or other photographic equipment that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of the SUBJECT OFFENSES

13. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of SUBJECT OFFENSES.

14. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of SUBJECT OFFENSES.

15. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to occupancy or ownership of the premises and use or ownership of computer equipment found in the premises, or that aid in the identification of persons involved in violations of SUBJECT OFFENSES.

16. Credit cards, credit card information, bills and payment records pertaining to violations of SUBJECT OFFENSES.

17. Information about usernames or any online accounts or email addresses that include Comcast or other Internet Service Providers used in the commission of violations of SUBJECT OFFENSES.

18. Computer(s), digital storage media, or digital storage devices, any physical object upon which computer data can be recorded, computer hardware, computer software, servers, computer related documentation, computer passwords and data security devices, gaming devices, tablets, flash drives, volatile data, digital communications

devices, cellular telephones, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices such as keyboards, mouse(s), scanners, printers, monitors, electronic media and network equipment, modems, routers, connection and power cords, and external or connected devices used for accessing computer storage media that was used to commit or facilitate commissions of the SUBJECT OFFENSES.

19. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, COMPUTER) that is called for by this warrant, or that might contain items otherwise called for by this warrant:

   a. evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

   b. evidence of software that may allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

   d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.  evidence of how and when the COMPUTER was used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

g.  records of or information about Internet Protocol addresses used by the COMPUTER

h.  evidence indicating the computer user's state of mind as it relates to the crime under investigation, namely crimes involving child exploitation and child pornography;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  contextual information necessary to understand the evidence described in this attachment;

l.  volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer.

m.  images and visual depictions of child pornography;

n.  records and information containing child erotica, including texts, images and visual depictions of child erotica;

o. any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of the SUBJECT OFFENSES;

p. any and all information, notes, documents, records, or correspondence, in any format or medium, concerning communications about child pornography or sexual activity with or sexual interest in minors;

q. items otherwise described above in paragraphs 1- 14 of this Attachment B.

DEFINITIONS:

20. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

21. "Child Pornography" is defined in 18 U.S.C. § 2256(8), which includes as any visual depiction of sexually explicit conduct involving the use of a minor; a digital image, computer image, or computer-generated image that is, or is indistinguishable from that of a minor engaged in sexually explicit conduct; or a visual depiction that has been created, adapted, or modified to appear than an identifiable minor is engaging in sexually explicit conduct.

22. "Visual depiction" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

23. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions; this also includes texts or discussions regarding minors engaged in sexual acts or conduct.

24. As used above, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.